

EOD

04/28/2009

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **DAVID S . HARWOOD** | § | Case No. 05-61254 |
| xxx-xx-6244 | § | |
| 8452 CR 2301, Arp, Texas 75750 | § | |
| | § | |
| Debtor | § | Chapter 7 |

| | | |
|---|---|---|
| FNFS, LTD and | § | |
| B & W FINANCE CO, INC. | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | Adversary No. 05-6064 |
| | § | |
| DAVID S. HARWOOD, | § | |
| | § | |
| Defendant | § | |

## AMENDED MEMORANDUM OF DECISION[1]

This matter is before the Court to consider the "Complaint Asserting Trusts,

Objecting to Discharge of Debtor Pursuant to §727 and Objecting to Dischargeability of

Debts Pursuant to 11 U.S.C. §523(a)" (the "Complaint") filed by FNFS, Ltd. ("FNFS")

and B&W Finance Co. Inc. ("B&W") (collectively, the "Plaintiffs") through which they

seek to deny the entry of a Chapter 7 discharge in favor of the Debtor, David S. Harwood

(hereinafter "Debtor" or "Harwood"), pursuant to 11 U.S.C. §727(a)(2)(A) or

---

[1] This amended memorandum incorporates the changes arising from the Court's determination of the Defendant's Request for Additional and Amended Findings of Fact and Conclusions of Law entered on April 28, 2009. The determination resulted in no change in the Judgment or any decretal order.

§727(a)(2)(B).  The Plaintiffs alternatively seek a determination that the debts owed to

them by the Debtor are excepted from discharge pursuant to §523(a)(2)(A) and (B),

§523(a)(4), or §523(a)(6).  Consolidated for consideration with the complaint were

requests for ancillary relief and the Plaintiffs' various objections to certain exemptions

claimed by the Debtor.  At the conclusion of the trial, the Court took the matter under

advisement.  This memorandum of decision disposes of all issues before the Court.[2]

## <u>Background</u>[3]

The Debtor, David S. Harwood, has been active in the banking and lending

industry since 1975.  He has successfully served in various officer and director positions

for commercial banks and claims to have pioneered the idea of offering financial

planning services within a commercial banking environment in Texas.[4]  He has held

prominent positions in various trade organizations supporting the lending industry and

has been significantly involved in the legislative programs initiated by such

organizations.[5]  He is clearly sophisticated and experienced in financial dealings.

In 1991, the Debtor, along with a gentleman named Wayne McKinney, purchased

---

[2]  This Court has jurisdiction to consider the Plaintiffs' Complaint pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157(a).  The Court has authority to enter a final judgment in this adversary proceeding since it constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(A), (B), (I), (J) and (K).

[3]  The agreed facts set forth by the parties in the Pre-Trial Order [dkt #80] are incorporated herein by reference as if fully set forth.

[4]  Plaintiffs' Ex. 35.

[5]  *Id.*

a consumer lending business known as B&W Finance.  This business was offering small

consumer loans primarily to the Hispanic community, and McKinney and Harwood

sought to expand B&W's operations beyond its rather limited geographic scope.

McKinney brought substantial financial means to the enterprise, but left the day-to-day

operations in the hands of the experienced banker, Harwood.  In 1996, the activities of

the various entities holding pieces of the B&W Finance puzzle were merged into a new

organizational structure whereby a new subchapter S corporation, B&W Finance Co.,

Inc., was formed, with Harwood and McKinney each owning 50% of the issued and

outstanding stock.  A new limited partnership, FNFS, Ltd.,[6] was also created in which the

new B&W corporation would own a 51% interest and serve as the sole general partner.

All existing B&W lending operations[7] were transferred to the new limited partnership,

which subsequently conducted business as B&W Finance under the new corporation's

managerial control, and limited partnership interests in FNFS, Ltd. were issued to the

holders of prior corporate debentures and sold to subsequent purchasers.  Eventually there

were 25 limited partners in FNFS, Ltd.

Under his designation as the President and Chief Operating Officer of B&W,

Harwood supervised and controlled the day-to-day operations of B&W.  However, B&W

---

[6] *See* Plaintiffs' Ex. 16.

[7] Immediately prior to the 1996 restructuring, the lending operations were occurring through a Delaware holding company and five Texas corporations, the most prominent of which was First National Financial Servicing, Inc., the apparent source of the "FNFS" moniker.

did not actually engage in any business operation other than supplying executive and managerial services to FNFS and its lending branches, and Harwood exercised virtually all executive power over FNFS operations on a daily basis.  He often referred to himself as the "president" of FNFS[8] which, while not technically accurate, was practically true in every sense.  He planned and supervised the growth and expansion of the FNFS lending locations.  He controlled the hiring, evaluation, promotion, and termination of FNFS employees, the number of which soon exceeded 100 at 25 B&W Finance locations.  No one with daily involvement in the company's affairs could challenge Harwood's authority or decision-making.  He managed all FNFS operations from the central office in Tyler.  He also managed to access substantial amounts of money from FNFS for his own individual use.

Continuing a seductive practice of withdrawing funds from the finance company whenever his personal needs so dictated, a habit that had begun with the predecessor companies in the years prior to the formation of FNFS, Ltd. in 1996, Harwood soon began to appropriate FNFS funds for his own use.  A substantial portion of the advances were used to acquire or to improve his personal assets.  Some of the withdrawals financed large acquisitions.  For example, in 1997, he borrowed $200,000 from FNFS in order to construct a large steel-framed gymnasium (referenced in the documents as a "multi-purpose office complex") on his separate property located at 8452 CR 2301 in Arp, Texas

---

[8] *See, e.g.*, Plaintiffs' Ex. 50 at p. 5 and Ex. 22-C at p. 3.

(the "Arp Property").[9]  Yet many of the other advances Harwood withdrew from FNFS

occurred on a more systematic basis — occurring monthly or bimonthly, usually in

$5,000, $10,000 or $15,000 increments.[10]  He eventually documented those withdrawals

of cash in June 1998 by issuing two promissory notes to FNFS, Ltd. — one known as the

"Master Note" in the amount of $700,000 due upon demand and regarding which

Harwood supposedly tendered to Wayne McKinney a deed of trust lien in favor of FNFS

upon the 20-acre Arp Property as security (though no such lien was never recorded)[11] —

and a second note known as the "Frazier Note" in the amount of $125,000,[12] also

purportedly accompanied by an unrecorded second-lien deed of trust in favor of FNFS

upon a residential rental property located at 527 E. Frazier in Tyler (the "Frazier

Property").[13]  These promissory notes and security documents in favor of FNFS were

completed on commercially-printed forms in Harwood's handwriting, signed by

Harwood, booked at his direction as assets of FNFS, but kept in a personal "loan file"

---

[9]  *See* Plaintiffs' Ex. 1-D and 1-E.  Though this note was executed in favor of "B&W Finance Co.," the money was clearly acquired from FNFS, Ltd.  This construction was initially justified as the initial steps of moving the corporate headquarters to the property.  However, that was never done; indeed, Harwood billed the company for "retreats" on those occasions when the property was used for corporate purposes.

[10]  Plaintiffs' Ex. 12-A.

[11]  Plaintiffs' Ex. 1-C.  The Master Note was subsequently secured by Harwood's stock interest in B&W Finance Co., Inc. as well.

[12]  Plaintiffs' Ex. 10.

[13]  Plaintiffs' Ex. 3.

that was kept in Harwood's desk.[14]  Notwithstanding his considerable experience in the

banking industry, Harwood admits that, despite his status as an officer and director of the

corporate general partner and his direct managerial control over FNFS operations, he

never filed the deeds of trust which he individually executed in favor of FNFS in the

public records.

From June 1998, Harwood continued to withdraw thousands of dollars from FNFS

for his own individual use.  Such actions directly violated the FNFS Handbook regarding

employee loans.[15]  Many of the advances were used to finance improvements to his Arp

property,[16] but other personal financial obligations were also met, including procuring a

$38,812 down payment, as well as draws for subsequent interest payments, on his

family's residence in the prestigious Hollytree subdivision in Tyler.  In one instance,

Harwood procured a $45,000 advance from FNFS to purchase a new Tahoe automobile

in his name for $38,743 in cash.[17]  Though FNFS funds played a significant role in the

acquisition of those personal assets, Harwood never granted a lien to FNFS on any of

---

[14]  Harwood's testimony that these transactions were reviewed or were based upon legal advice from unidentified attorneys is not credible.

[15]  Plaintiffs' Ex. 50 at p.9.  Despite presenting himself as president of FNFS in its handbook, Harwood contends that he was not an employee of FNFS and that its policies toward branch office employees were inapplicable to him as a 50% shareholder in B&W Finance Co., Inc.  At least in hindsight, that view was not shared by the board of directors.

[16]  *See* Plaintiffs' Ex. 68.

[17]  Plaintiffs' Ex. 52.  Harwood failed to provide FNFS a lien on that vehicle even though it supplied the purchase money for it.  Harwood claimed at trial to have repaid FNFS for the Tahoe advance from sums subsequently borrowed from Hibernia National Bank — testimony which was inconsistent with his prior testimony about the Hibernia loan proceeds.

**-6-**

those purchased assets to secure repayment of those advances.  In another instance, he directed his staff to tender to him a check for almost $10,000 as "mileage reimbursement for 30,000 miles" with no supporting documentation.[18]  To further supplement his stream of income from the company, Harwood also placed his wife, Sherry Harwood, on the B&W corporate payroll from 1997 through the time of their separation in 2004 in the amount of $500 bi-weekly,[19]  although she admittedly performed no tangible service for the company.[20]  He flew the company's airplane at company expense.  He normally accrued expenses on an American Express Business Platinum account held in the name of "David S. Harwood, 1st Nat. Fin. Svc. Inc."[21] and offered only limited efforts to differentiate between personal and business expenses.[22]

There was no formal procedure for Harwood to obtain all of these financial benefits from FNFS. He was in day-to-day control of both B&W and FNFS.  He merely gave oral demands for advances or for expense reimbursement to subordinate employees

---

[18]  Plaintiffs' Ex. 43.

[19]  Plaintiffs' Ex. 41.  Harwood admitted that he frequently just endorsed her payroll checks for her without her involvement until the implementation of direct-deposit procedures in 2001 eliminated the need for any endorsement.  In the eight-year period, "she" was paid the total of $106,100.00.

[20]  Ms. Harwood testified credibly that her ex-husband handled all financial affairs for the family during their marriage and that, while she may have occasionally signed financial documents from the company at his direction, she never provided services to FNFS and was never actually aware of what money came into their household from FNFS.

[21]  Plaintiffs' Ex. 46.  That stood for First National Financial Servicing, Inc., a corporate predecessor of B&W.  *See supra* note 7.

[22]  *See infra* note 23.

which were immediately satisfied.[23]  He considered the payments as advances under the Master Note, although he exceeded any purported debt ceiling with impunity, often issuing individual notes to FNFS when his needs would cause the aggregate amount of indebtedness to exceed the amount of the Master Note.[24] The Master Note would then be "extended and renewed" to incorporate all of the advances, the last such extension having been executed in January 2003,[25] along with the final extension of the Frazier Note.[26]

For years there was never any inquiry regarding the propriety of, or the threat posed by, the burgeoning Harwood indebtedness to FNFS.  Disbursements and repayments were never tracked on an amortization sheet.  Indeed, Harwood rarely made any significant net reductions in the principal amount of the obligations, nor did he ever provide, nor was he ever asked to provide, a personal financial statement to the company in an effort to demonstrate that he was, in fact, capable of repaying the increasing debt. Harwood acknowledged that he made only intermittent payments on the obligations, and failed to pay interest on a quarterly basis as required by the Notes.  There were, in fact, episodes in which Harwood, in order to create the illusion of servicing the Notes, made

---

[23]  The same unilateral procedure applied to expenses incurred by Harwood, purportedly for company business.  Kathy Mallory's testimony in this regard was direct and credible.  The only governing policy was to do as Harwood directed.  If he said it was a business expense, it was booked that way.  If he requested reimbursement for an expense, the reimbursement was immediately processed without regard to whether he could document such expense.

[24]  Plaintiffs' Ex. 14.

[25]  Plaintiffs' Ex. 1.

[26]  Plaintiffs' Ex. 2.

"interest payments" to FNFS from deposits to his personal checking account derived by simply drawing another advance from the company's own pockets.[27]

Harwood claims that all of these financial benefits were approved by the Board of Directors.  While evidence of formal approval upon full disclosure is sketchy, there is little evidence to suggest that any person with actual authority at B&W or FNFS ever became concerned about the rising amount of the Harwood indebtedness prior to September 2004.  As a board of a privately-held subchapter S corporation owned by two managing stockholders, the board members focused upon the overall financial performance of FNFS and gave little attention to the day-to-day operations or to what perks were being provided to corporate officers.  The Board was generally aware of the employee loans owed by Harwood, but were told that the loans were sufficiently collateralized[28] and there was no indication from the audit reports that the loans should be of any concern to the Board.  There is no indication that the Board knew or took action regarding the Sherry Harwood employment issue, or any controversy over expense reimbursements, until late in 2004.

Indeed, to the extent that any serious concern regarding Harwood was expressed prior to mid-2004, the most credible evidence suggests that Harwood was protected from

---

[27] *See, e.g.*, corresponding deposit and withdrawal entries in the following exhibits: Plaintiffs' Ex. 12-B [12-31-01]; Ex 12-C [12-30-02] and Ex 12-C [1-13-04].

[28] No board member ever took independent action prior to the formation of the Audit Committee to confirm the sufficiency of the purported collateral or its status.

any negative ramifications by the personal and financial influence of Wayne McKinney, the CEO and Harwood's fellow co-owner of the corporate general partner. While McKinney undoubtedly knew that Harwood was taking advances from the FNFS coffers, there is little evidence by which to gauge accurately the actual knowledge of McKinney regarding the size of the Harwood indebtedness or the frequency with which Harwood was making such draws, other than the self-serving testimony of Harwood himself. Harwood claims that McKinney was aware of all of the documentation and all of the circumstances, yet the documentation regarding the debt was kept under Harwood's exclusive control. Harwood suggests the existence of a very close, trusting, personal relationship with McKinney. While that seems dubious, there is certainly no indication in the record that McKinney ever took any action to discourage Harwood from taking money from FNFS, and the evidence suggests that any discomfort expressed by any board member about the growing Harwood indebtedness (in light of continuing annual losses by FNFS) was apparently placated by verbal assurances from the deep-pocketed McKinney that the individual investments of the limited partners would never be lost or compromised by Harwood's actions. It was not until after McKinney's death in September 2004 that heightened concerns were expressed and actions were taken to address the Harwood dilemma.

Even McKinney's death might not have brought greater scrutiny to the Harwood-FNFS transactions had it not been for growing losses suffered by the business in 2002-

2005[29] and the company's struggle to maintain the net capital reserves required by state regulators.  These continuing losses led to greater concern on behalf of board members.  An audit committee was formed by the board in 2004 at the suggestion of the auditors and, though it investigated other internal weaknesses affecting the financial soundness of the company,  it quickly focused upon Harwood's unfettered access to FNFS funds and the financial damage which that access had inflicted upon the company.  The committee subsequently discovered to its horror that the Harwood advances were not collateralized as represented.  Not only could the committee find no evidence that the deeds of trust had been recorded, it could not locate any deed of trust at all on either the Arp Property,[30] or on the Frazier Property,[31] nor could it locate Harwood's pledged corporate stock certificates.[32]

       With the death of McKinney, the discovery regarding the status of the collateral on

_____

[29]  See Plaintiffs' Ex. 22-A at p. B6090 in which the 2005 audit showed a 2004 loss of $849,521 and a 2005 loss of $533,755 for FNFS.

[30]  Harwood claims that the Arp property was released as collateral sometime between 1998 and 2003.  It is true that his representations to the auditors regarding the collateral securing the Master Note at some point deleted any reference to a deed of trust on the Arp property.  However, the 2000 promissory note [Ex. 1-A], renewing and extending the 1998 Note, references the 20-acre tract as collateral.  Despite his protestations to the contrary, Harwood produced insufficient evidence, and no independent corroborating evidence, to establish the existence of any such release.  However, Capital One Bank (formerly Hibernia) holds a senior secured position as to that property.

[31]  The deed of trust on the Frazier property was subsequently located and finally recorded in January 2005.  However, the Chapter 7 trustee challenged the legitimacy of this transfer since it occurred within one year of the filing of Harwood's bankruptcy petition.  FNFS settled with the trustee and received only a portion of the proceeds [$99,712.61] that it otherwise would have recovered had the deed of trust been timely recorded. See stipulations of fact ¶¶ 34 and 35.

[32]  The stock certificates were eventually reissued in September 2004.  See Plaintiffs' Ex. 5.

the Harwood obligations, and the revelation that Harwood had dipped into the FNFS

coffers yet again in September 2004 to tender a $5,419 payment to Hibernia to payoff his

personal debt on the Frazier property,[33] the Board moved quickly to block any further

advances and to restrict Harwood's ability to incur any further extraordinary expenses.

As the company's financial performance languished at the close of 2004, the

controversy over the effectiveness of Harwood's leadership mushroomed.  No resolution

of any of the expense controversies had been reached and the principal balance of the

unpaid Harwood notes stood at $843,969.73, together with accrued and unpaid interest on

the notes in the amount of $71,802.79.  All requests for a Harwood repayment proposal

were delayed or ignored.  Thus, when a dispute arose in the first quarter of 2005 over

whether Harwood had exceeded Board authorization to create B&W Finance lending

kiosks at a time of continuing economic distress for the company, given Harwood's

continuing failure to tender a feasible repayment plan on his loans as requested, the Board

terminated Harwood's employment in April 2005.

On June 7, 2005, B&W and FNFS filed a lawsuit against Harwood in the County

Court at Law of Smith County, Texas to collect the indebtedness allegedly owed by him

to those entities.  In partial response thereto, on June 15, 2005, Harwood filed a voluntary

petition for relief under Chapter 7 of the Bankruptcy Code.  Subsequently, in addition to

challenging certain of the Debtor's claims of exemption, the Plaintiffs also initiated this

---

[33]  Plaintiffs' Ex. 38.

adversary proceeding to determine the Debtor's right to a discharge or, alternatively, whether the debt owed to them respectively might be properly excepted from the scope of any discharge which might otherwise be entered.

Following the entry of agreed relief from the automatic stay, the Plaintiffs proceeded in the post-petition period to liquidate the existing collateral securing the payment of the indebtedness owed by the Debtor to them. The Frazier Property was sold and the Plaintiffs, through a stipulated settlement with the Chapter 7 Trustee who had challenged the delinquent recording of the Frazier deed of trust as preferential, received $99,712.61 to apply to Harwood's outstanding indebtedness. The corporate stock of B&W owned by Harwood was subsequently liquidated by the Plaintiffs in the post-petition period at an average price of $175 per share, as a result of a commercially reasonable sales process,[34] resulting in the receipt of $438,817.50. Thus, the aggregate

---

[34] The Court thus rejects Harwood's contention, based upon certain legislative changes in the marketplace and the valuation testimony of David Marshall, that FNFS failed to obtain a fair value in its disposition of his 2,507 shares of B&W corporate stock. The Marshall valuation was ill-founded and not credible in this circumstance. It failed to account for the lack of control evidenced by Harwood's share percentage, the effect of transfer restrictions, as well as the subchapter S status of the corporation. The evidence establishes that FNFS personnel endeavored to obtain the best price possible for the disposition of the stock, given the limited market for such stock, the closely-held nature of the corporation, the taint which existed due to the Harwood problems, the general economic problems of the company, and the limitations placed upon it by regulatory authorities. *See* 3 Tex. Bus. & Comm. Code §9.610(b) (Vernon 2002). Thus, it is not surprising that the stock could be successfully marketed only to existing board members. Certainly Harwood had an opportunity to find other buyers to improve the price received [Plaintiffs' Ex. 71] but failed to do so. The value received from the stock sale is actually fairly consistent with the more credible analysis of Tony K. Morgan regarding the proper valuation of the stock. Further, the fact that a greater amount might have been obtained through a different process or marketed at a different time is not singularly sufficient to preclude a finding of commercial reasonableness. 3 Tex. Bus. & Comm. Code §9.627(a) (Vernon 2002).

-13-

sum of $538,530.11 was applied by FNFS in the post-petition period toward the

satisfaction of the Harwood debt.

The Plaintiffs seek to deny a discharge to Harwood or, alternatively, seek a

determination that certain indebtedness owed to them respectively should be declared

nondischargeable.  B&W seeks a recovery from Harwood and a nondischargeability

determination that the aggregate sum of $157,771.04 consisting of:

   (1)  Chevron credit card expenses:          $  2,926.22;
   (2)  Airplane expenses                       $ 38,994.82;
   (3)  1-11-01 "mileage expense":       $  9,750.00; and
   (4)  1996-2004 payments to Sherry Harwood:  $106,100.00.

FNFS seeks to recover the sum of $854,025.44 based upon the following principal

amounts, plus the accrual of post-trial interest on the two promissory notes:

   (1) Master Note:                   $553,699.94[35]
   (2) Frazier Note:                   $  31,049.85[36]
   (3) allegedly personal AMEX expenses: $249,675.65
   (4) rentals paid on Arp Property:     $  19,600.00.


## Discussion

*Denial of Discharge Under Section 727(a)(2).*

The Plaintiffs first challenge the Debtor's entitlement to any discharge of any debts

---

[35]  Plaintiffs' Ex. 13

[36]  *Id.*

under the provisions of 11 U.S.C. §727(a)(2)(A) and (a)(2)(B).[37]  Since a denial of the

Debtor's discharge would render moot any complaint under §523, the Court will first

address the §727 allegations.

It is axiomatic that the denial of a debtor's discharge is a harsh remedy and the

provisions set forth in §727(a) are precisely drawn so as to encompass only those debtors

who have not been honest and forthcoming about their affairs.  *Buckeye Retirement*

*Properties v. Tauber (In re Tauber)*, 349 B.R. 540, 545 (Bankr. N.D. Ind. 2006) ["The

denial of a debtor's discharge is akin to financial capital punishment. It is reserved for the

most egregious misconduct by a debtor."].  Thus, in order to accomplish that limited

purpose, the provisions of §727(a) are to be construed liberally in favor of granting

debtors the fresh start contemplated by the Bankruptcy Code and construed strictly

against parties seeking to deny the granting of a debtor's discharge.  *In re Ichinose,* 946

F.2d 1169, 1172 (5th Cir. 1991); *Melancon v. Jones (In re Jones)*, 292 B.R. 555, 559

(Bankr. E.D. Tex. 2003).  As the Plaintiff seeking such relief, the Plaintiff bears the

burden of proving that the Debtor is not entitled to a discharge under §727.  The standard

of proof for its claim is a preponderance of the evidence.  *See, e.g., Everspring Enter.,*

---

[37]  The Plaintiffs' complaint also contained an allegation under §727(a)(3) for failure to preserve documentation but that allegation was not addressed by the Plaintiffs at trial and was legally abandoned by its exclusion from the pre-trial order.  *Kona Technology Corp. v. Southern Pacific Transp. Co.*, 225 F.3d 595, 604 (5th Cir. 2000) ["It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial."]; *see also Moser v. Mullican (In re Mullican)*, 2008 WL 5191196 at *12 (Bankr. E.D. Tex., Sept. 30, 2008) [noting that "a claim or defense not raised in the pre-trial order may be deemed waived, even if it appeared in the complaint"], *citing Elvis Presley Enterprises v. Capece*, 141 F.3d 188, 206 (5th Cir. 1998).

**-15-**

*Inc. v. Wang (In re Wang)*, 247 B.R. 211, 213-14 (Bankr. E.D. Tex. 2000) ("The standard

of proof for allegations ... under §727, is by a preponderance of the evidence.") (*citing*

*Grogan v. Garner*, 498 U.S. 279, 112 L. Ed. 2d 755, 111 S. Ct. 654 (1991) and *Mozeika*

*v. Townsley (In re Townsley)*, 195 B.R. 54 (Bankr. E.D. Tex. 1996)).

The complaint seeks to deny a discharge to Harwood under §727(a)(2).  This

statute provides that:

> (a)      The court shall grant the debtor a discharge unless —
>> (2)  the debtor, with intent to hinder, delay, or defraud a creditor or an
>> officer of the estate ... has transferred, removed, destroyed,
>> mutilated, or concealed, or has permitted to be transferred, removed,
>> destroyed, mutilated, or concealed —
>>> (A)  property of the debtor, within one year before the date of the
>>> filing of the petition; or
>>> (B) property of the estate, after the date of the filing of the petition.

Thus, in order to establish grounds for denial of a discharge under §727(a)(2)(A),

the Plaintiffs must demonstrate by a preponderance of the evidence that there was: (1) a

transfer of property; (2) belonging to the debtor; (3) within one year of the filing of the

petition; and (4) performed with an intent to hinder, delay or defraud a creditor or an

officer of the estate.  *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 90 (5th Cir. 1989).

"The elements for §727(a)(2)(B) are substantially the same as those for §727(a)(2)(A)

except that the plaintiff must prove that the debtor transferred or concealed property of

the estate after the bankruptcy petition was filed."  *Brandon v. Saba (In re Saba)*, 2007

**-16-**

WL 3071605 (Bankr. E.D. La., Oct. 19, 2007), *citing Rouse v. Stanke (In re Stanke)*, 234

B.R. 449, 456-57 (Bankr. W.D. Mo. 1999).  In both instances, a plaintiff must

demonstrate by a preponderance of the evidence an actual intent to hinder, delay, or

defraud creditors — a constructive intent is insufficient.  *Chastant,* 873 F.2d at 91; *Martin*

*Marietta Matl's Southwest, Inc. v. Lee*, 309 B.R. 468, 481 (Bankr. W.D. Tex. 2004).

However, "a court may infer such actual intent from the circumstances of the debtor's

conduct."  *NCNB Texas Nat'l Bank v. Bowyer (In re Bowyer)*, 916 F.2d 1056, 1059 (5th

Cir. 1990) *rev'd*, 932 F.2d 1100 (5th Cir. 1991) (*citing Smiley v. First Nat'l Bank of*

*Belleville (In re Smiley)*, 864 F.2d 562, 565 (7th Cir. 1989)).  The Plaintiffs assert the

existence of a §727(a)(2) violation arising from the Debtor's failure to list the Hollytree

property in his schedules and his alleged failure to account for cash on hand on the

petition date, as well as certain post-petition cash transactions.

There is no dispute that the Debtor did not list the Hollytree property [7206

Pinetree Place in Tyler] on his Schedule A in this case[38] nor is there any dispute that the

Debtor executed a special warranty deed to Sherry Harwood on August 24, 2005

immediately prior to a sale of the Hollytree property by Sherry Harwood on that date.[39]

However, those events were dictated by the resolution of the divorce action filed by

Sherry Harwood against the Debtor in 2004 in the 321st Judicial District Court of Smith

---

[38]  *See* Plaintiffs' Ex. 11.

[39]  Plaintiffs' Ex. 34 and 34-A.

**-17-**

County, Texas.  Based upon a property settlement, which had been mediated earlier that year between the parties, the presiding judge in that divorce action awarded the Hollytree property to Sherry Harwood as her sole and separate property in a trial conducted on May 24, 2005, and subsequently entered a divorce decree memorializing that award on June 15, 2005 – the very day that the Debtor filed his bankruptcy petition in this case.[40]  Sherry Harwood subsequently elected to sell that property to realize her equity interest therein and, in recognition of the full and complete title awarded to Sherry Harwood as a result of the divorce decree and to facilitate the pending sale by her, the Debtor executed the warranty deed to Sherry Harwood.  That warranty deed specifically noted the division of property arising from the divorce decree, that Sherry Harwood had assumed all responsibility in the divorce decree for the underlying promissory note, and that David Harwood was entitled to complete indemnity from Sherry Harwood from May 24, 2005 for any liability arising from the promissory note — thus implicitly recognizing that title had been divested from the Debtor on May 24, 2005.[41]

Notwithstanding those events, the Plaintiffs contend that the Debtor retained at least some semblance of title as of June 15, 2005, that the Hollytree property constituted property of the bankruptcy estate and that, notwithstanding the divorce proceedings, the Debtor's failure to list the Hollytree property on his Schedule A evidences an intent by

---

[40]  Defendant's Ex. GGG at p. 29.

[41]  Plaintiffs' Ex. 34-A.

the Debtor to hinder, delay, or defraud a creditor or an officer of the estate.  Actually, nothing could be further from the truth.

The awarding of the Hollytree property to Sherry Harwood was binding upon the Debtor as a contractual agreement arising from the mediated settlement agreement and subsequently as a final judgment of the family court as of May 24, 2005.  *McCray v. McCray*, 584 S.W.2d 279 (Tex. 1979); *Oliveras v. Oliveras*, 2008 WL 2454371 at *2 (Tex. App. – Corpus Christi, Jan. 29, 2008); *Chess v. Chess*, 627 S.W.2d 513 (Tex. App. – Corpus Christi 1982, no writ).  The Debtor was divested of title to that property as of that date and his subsequent execution of the deed to his ex-wife was merely a ministerial act which otherwise could have been compelled by the family district court in aid of the divorce decree.  *See* 1A TEX. FAM. CODE ANN. §§ 9.002 and 9.006 (Vernon 2006).  Thus, it did not constitute property of the bankruptcy estate as of June 15, 2005 and its omission from Schedule A was entirely appropriate.  Even if, *arguendo*, some semblance of title to the Hollytree property remained in the Debtor on the date of filing, its omission from the schedules (which were not filed until July 12, 2005) under the foregoing circumstances, fully known to the Trustee, does not constitute evidence of an intent by Harwood to hinder, delay, or defraud a creditor or an officer of the estate sufficient to deny him a discharge pursuant to §727(a)(2)(A) or (B).[42]

Neither have the Plaintiffs carried their burden of proof to establish grounds to deny the Debtor's discharge under §727(a)(2)(B) arising from any failure of the Debtor to

---

[42]  The Trustee recognized these facts and did not seek to obtain any part of the $29,073.09 of equity which was ultimately received by Sherry Harwood as a result of that sale.

account for cash in the post-petition period.  The Debtor's scheduling of cash and deposit account amounts existing on the Petition Date has been consistent throughout the case and has been reflected *verbatim* in each interim status report filed by the Chapter 7 trustee without challenge.  Other questions raised about the Debtor's use of cash in the post-petition period were satisfactorily answered by the Debtor at trial.  Thus, the Court concludes that the evidence tendered by the Plaintiffs in this regard was insufficient to call the accuracy of the schedules into serious question, and it falls substantially short of establishing an evidentiary foundation sufficient to deny the Debtor's discharge under §727(a)(2)(A) or (B).  Accordingly, the Court will issue an order of discharge for the Debtor.

*Nondischargeability of Debt Under Section 523(a).*

Notwithstanding the Debtor's right to a discharge, the Plaintiffs alternatively seek a determination that the debts owed to them by the Debtor are nondischargeable under various subsections of §523(a).  Similar to the consideration of the objection to discharge, the Plaintiffs assume the burden of proof under a preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 286 (1991) and all exceptions to discharge under §523 "must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start."[43]  *In re Hudson*, 107 F.3d 355, 356 (5th Cir. 1997).

---

[43]  However, a fresh start is not promised to all who file for bankruptcy relief, but only to "the honest but unfortunate debtor."  *Grogan*, 498 U.S. at 286-87.

*Nondischargeability Under § 523(a)(6): Debt Arising from Willful and Malicious Injury*

Section 523(a)(6) provides that:

A discharge under Section 727...of this title does not discharge an
individual debtor from any debt —

> for willful and malicious injury by the debtor to another entity
> or to the property of another entity.

The United States Supreme Court has re-examined in recent years whether the

scope of §523(a)(6) encompasses all intentional acts that cause injury, or only acts done

with an actual intent to cause injury. *Kawaauhau v. Geiger*, 523 U.S. 57 (1998). In

*Geiger*, the Court stated:

> The word "willful" in (a)(6) modifies the word "injury", *indicating that
> nondischargeability takes a deliberate or intentional injury, not merely a
> deliberate or intentional act that leads to injury*. Had Congress meant to
> exempt debts resulting from unintentionally inflicted injuries, it might have
> described instead "willful acts that cause injury." Or, Congress might have
> selected an additional word or words, i.e., "reckless" or "negligent," to
> modify "injury." Moreover ..., the (a)(6) formulation triggers in the
> lawyer's mind the category "intentional torts," as distinguished from
> negligent or reckless torts. Intentional torts generally require that the actor
> intend "the consequences of an act," not simply "the act itself."
> RESTATEMENT (SECOND) OF TORTS § 8A, comment *a*, p. 15 (1964).

*Id*. at 61-62 (emphasis added). The Supreme Court concluded that to construe the statute

more broadly, i.e. finding a debt nondischargeable if it arose from an intentional act that

ultimately led to injury, would wrongfully place within the excepted category a wide

-21-

range of situations in which an act is intentional, but injury is unintended.[44]

Thus, the Supreme Court decision in *Geiger* clearly requires that an actor inflict a deliberate or intentional injury, not merely that an actor take a deliberate or intentional act that leads to injury. That decision constituted a significant narrowing of the scope of debts which can be deemed nondischargeable under § 523(a)(6), *Berger v. Buck (In re Buck)* 220 B.R. 999, 1004 (10th Cir. B.A.P. 1998), and predictably prompted courts to engage in efforts to isolate and to identify those deliberate or intentional actions involving an "actual intent to cause injury," as would be necessary to meet the definition of "willful" under *Geiger*, from other deliberate or intentional acts that lead to injury.

In *Miller v. J. D. Abrams, Inc., (In re Miller)*, 156 F.3d 598 (5th Cir. 1998), *cert. denied,* 526 U.S. 1016 (1999), the Fifth Circuit analyzed the *Geiger* ruling in an effort to articulate a methodology by which to distinguish between acts intended to *cause* injury as opposed to those merely *leading* to injury. It concluded that the mere fact that an action is traditionally identified as an "intentional tort" does not necessarily mean that any injury

---

[44] One example specifically mentioned by the Supreme Court was a debt arising from a "knowing breach of contract." The Court observed that "a construction so broad would be incompatible with the "well-known" guide that exceptions to discharge should be confined to those plainly expressed. 523 U.S. at 62. The Supreme Court thus concluded that negligent or reckless acts are not sufficient to establish that a resulting injury is "willful and malicious" and that, therefore, "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Id.* at 64. However, the Fifth Circuit has suggested that the exclusion of a knowing breach of contract from the confines of §523(a)(6) may not be absolute. *See Williams v. IBEW Local 520 (In re Williams)*, 337 F.3d 504, 510 (5th Cir. 2003) ["the dischargeability of contractual debts under Section 523(a)(6) depends upon the knowledge and intent of the debtor at the time of the breach, rather than whether conduct is classified as a tort or falls within another statutory exception to discharge"]; *see also*, *Texas v. Walker*, 142 F.3d 813, 823 (5th Cir. 1998).

-22-

caused thereby is willful. It thus found the label of "intentional tort" to be "too elusive" to distinguish accurately between those two categories of intentional conduct. *Id*. at 603. Instead, the *Miller* court determined that a "willful...injury" is established under §523(a)(6) when there exists either: (1) an objective substantial certainty of harm arising from a deliberate or intentional action or (2) there is a subjective motive to cause harm by a party taking a deliberate or intentional action. It further determined that the standard for determining the existence of a "willful" injury under *Geiger* had subsumed the Circuit's former standard for determining "malicious" conduct under §523(a)(6) ["without just cause or excuse"] and had eliminated any need to conduct a separate analysis on that malice element. *Id*. at 604-06. Accordingly, the Fifth Circuit has determined that "[t]he test for willful and malicious injury under Section 523(a)(6), thus, is condensed into a single inquiry of whether there exists 'either an objective substantial certainty of harm or a subjective motive to cause harm' on the part of the debtor." *Williams v. IBEW Local 520 (In re Williams)*, 337 F.3d 504, 509 (5th Cir. 2003).

Despite all of the intentional actions which Harwood took for his own personal benefit, there is insufficient evidence in the record to establish that he possessed a subjective intent to inflict an injury upon the Plaintiffs. Thus, the question is whether the Plaintiffs have presented sufficient evidence to demonstrate that an objective substantial certainty of harm was created by Harwood's actions, when taken. The Court finds that they have not. The lack of substantial certainty in this regard must be adjudged at the

time of each action or inaction by Harwood and is aptly demonstrated by the inaction (perhaps justified) of the directors or other limited partners as Harwood's actions were being taken down through the series of years.  No action was taken because no injury was certain.  The directors perceived that Harwood's executive actions as chief operating officer were protected and effectively endorsed by Wayne McKinney.  McKinney certainly defended Harwood and gave assurances to any concerned party that, ***if*** (and the operative word here is "if") any detrimental effect were to be inflicted upon the company or any limited partner as a result of Harwood's administration of the company, he would make it right.  The directors and other interested parties relied upon those assurances and they buttressed a general reluctance of any party to react to Harwood's actions in recognition of the fact that these were distributions to a 50% stockholder, which were apparently endorsed by the other 50% stockholder.  This atmosphere remained until after McKinney's death and after the economic performance of the entities had failed to improve over a number of years.  Indeed the actions or, more correctly, the inactions of all of the parties demonstrate that actual injury to this closely-held corporation and its subsidiary arising from the acts of Harwood was anything but certain.  Since the Plaintiffs have failed to demonstrate the presence of "explicit evidence" that the Debtor's actions would cause injury to the creditors, *Williams*, 337 F.3d at 511, their respective requests to hold Harwood's indebtedness nondischargeable under §523(a)(6) must be denied.

*Nondischargeability Under 523(a)(2)(A): Debt Arising by Fraud, False Pretenses,*
*or False Representation*

11 U.S.C. §523(a)(2)(A) provides that:

a discharge under §727 of this title does not discharge an individual debtor from any debt for money, property, or services, ... to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

Section 523(a)(2)(A) encompasses similar but distinct causes of action.  Though other circuits have applied a uniform standard to all § 523(a)(2)(A) actions,[45] the Fifth Circuit has distinguished the elements of "actual fraud" and of "false pretenses and false representations."  *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1291 (5th Cir. 1995).

To have a debt excepted from discharge pursuant to the "actual fraud" provision in § 523(a)(2)(A), an objecting creditor must prove that (1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) the creditor justifiably relied on such representation; and (5) the creditor sustained losses as a proximate result of the representations.  *Id.* at 1293, *as modified by the United States*

---

[45]  *See, e.g., Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991); *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987).  Though some bankruptcy courts outside of the Fifth Circuit have cited the decision of the United States Supreme Court in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351(1995), in support of their proposition that all of the §523(a)(2)(A) actions are governed by the elements for actual fraud, *see, e.g., AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth)*, 212 B.R. 326 (Bankr. W.D. Mo. 1997); *AT & T Universal Card Services v. Alvi (In re Alvi)*, 191 B.R. 724 (Bankr. N.D. Ill. 1996); the Supreme Court in that case was actually distinguishing the language used in §523(a)(2)(A) from that utilized in §523(a)(2)(B) in order to determine the degree of reliance necessary above mere reliance in fact in order to exempt a debt from discharge under (a)(2)(A).  Since the Supreme Court specifically refused to even apply their direct holding regarding the degree of  reliance in actual fraud cases to cases of false pretense or false representation, 116 S.Ct. at 443, n. 8, the statement that the Court erased all distinctions between the three (a)(2)(A) actions strains credibility.

*Supreme Court decision of Field v. Mans*, 516 U.S. 59 (1995) [regarding the proper

standard of reliance].

A debt may also be declared nondischargeable if it was obtained by false pretenses

or by a false representation.  While "false pretenses" and "false representation" both

involve intentional conduct intended to create and foster a false impression, the

distinction is that a false representation involves an express statement, while a claim of

false pretenses may be premised on misleading conduct without an explicit statement.

*See Walker v. Davis (In re Davis),* 377 B.R. 827, 834 (Bankr. E.D. Tex. 2007); and *Haney*

*v. Copeland (In re Copeland)*, 291 B.R. 740, 760 (Bankr. E.D. Tenn. 2003).  In order for

a debtor's representation to constitute a false pretense or a false representation, it "must

have been: (1) [a] knowing and fraudulent falsehood, (2) describing past or current facts,

(3) that [was] relied upon by the other party."[46]  *In re Allison*, 960 F.2d at 483; *see also*

*Bercier v. Bank of La. (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991) ("to be a false

representation or false pretense under § 523(a)(2), the false representations and false

pretenses must encompass statements that falsely purport to depict current or past facts").

Thus, the distinction recognized by the Fifth Circuit appears to be a chronological

one, resting upon whether a debtor's representation is made with reference to a future

---

[46] Though the Supreme Court in *Field v. Mans* avoided a determination of the degree of reliance required in a false pretense or false representation case, it is reasonable to assume that justifiable reliance, in addition to reliance in fact, is the correct level of reliance required to sustain a finding of nondischargeability in a false pretense or false representation case.  *In re Hernandez*, 208 B.R. 872, 876 n.4 (Bankr. W.D. Tex. 1997).

event as opposed to a representation regarding a past or existing fact. *In re Bercier*, 943 F.2d at 692 (A debtor's promise...related to a future action which does not purport to depict current or past fact...therefore cannot be defined as a false representation or a false pretense).[47]

The Plaintiffs have each failed to sustain their burden of proof to demonstrate that Harwood's debt to them was <u>procured</u> by actual fraud. Indeed, it is difficult even to identify exactly what representation the Plaintiffs claim was supposedly made by Harwood regarding future action that induced the creation of the debts. Harwood actually was simply continuing a pattern of self-dealing managerial conduct that had occurred under the old multi-company environment. In that earlier environment, Harwood was allowed the personal privilege of dipping into the company's coffers for personal reasons, ostensibly with the knowledge and blessing of Wayne McKinney. Though that type of conduct is often overlooked in a closely-held corporate environment between two shareholders, that environment changed when the new corporation and the limited partnership were created. Greater scrutiny of officer conduct was mandated, particularly in light of the fiduciary duty to FNFS which the new corporation had assumed, but that scrutiny failed to materialize. Instead, it was business as usual in the internal operations of the new B&W Finance Co., Inc. Harwood received McKinney's blessing to essentially

---

[47]   Though some in this circuit have rejected these parallel tests as a distinction without a difference and proceeded with a unitary approach to the problem, *see In re Melancon*, 223 B.R. 300, 308 (Bankr. M.D. La. 1998), this Court feels compelled to recognize and attempt to apply the distinction drawn by the circuit court.

create a line of credit for himself from the new FNFS accounts.  McKinney mistakenly trusted Harwood and kept others with growing suspicions at bay.  Thus, notwithstanding its new role as a general partner of FNFS, the "new" corporate environment of B&W Finance Co., Inc. really was no different than that of its predecessors and that environment, dominated by the power and personality of Wayne McKinney and cleverly utilized by Harwood to his own personal advantage, led to the creation and growth of the Harwood indebtedness to FNFS.

The Plaintiffs have also failed to sustain their burden of proof to demonstrate that Harwood's debt to FNFS was procured by false pretenses or by a false representation. FNFS asserts that Harwood affirmatively misled it regarding the collateral, specifically the deeds of trust, which stood to secure the repayment of the two promissory notes.  Yet the Plaintiffs have failed to produce any evidence of any express statement by Harwood that there was a *recorded* deed of trust securing either of his promissory notes to FNFS. The gist of the Plaintiffs' complaint in this regard is that Harwood failed to inform them that it was <u>not</u> recorded.  The evidence establishes that Harwood referenced the debts as *secured* by the deeds of trust (which they were as to him) and that the deeds of trust had been given to McKinney, leaving only perhaps an implication, but not the representation, that McKinney had recorded the documents and that the liens created by such documents had been established as against the rights of third parties.[48]  No one apparently checked

---

[48]  It is significant in this context that the implication properly raised by the evidence pertains to McKinney's actions and not to any implied representation by Harwood that the recordation had actually

with McKinney.  Any misperception by the directors may have been based on a number

of other factors as well, including the fact that none of them were going to challenge

Wayne McKinney's authority or executive leadership in any sense.  Even if the board

members had possessed express knowledge that the deeds of trust had not been recorded,

any assumption that they would have challenged McKinney, at least prior to 2004, and

curtailed Harwood's authority to receive advances is dubious and unsupported by the

evidence.  Indeed, the evidence shows that, by early 2004, Harwood was affirmatively

stating to everyone that the much larger "master note" to FNFS, then exceeding $733,000,

was no longer secured by a deed of trust at all,[49] yet the directors took no action at that

time to curb Harwood's access to funds or to confirm the existence of a recorded deed of

trust.  In obtaining this debt, Harwood may have been shrewd, but he did not affirmatively

mislead the directors about the recordation of the deed of trust by statement or

implication.  He let them draw their own conclusions about McKinney's actions and

utilized the friendship of McKinney as an effective shield against further inquiry.  While

that conduct might not be laudable, it is insufficient to render Harwood's debt to FNFS

nondischargeable under §523(a)(2)(A).

*Nondischargeability under § 523(a)(2)(B)*:  *Debt Obtained by the Use of a*
                                        *Materially False Financial Statement*

        For similar reasons, the Plaintiffs' complaint that the Harwood indebtedness to

_____

taken place.

        [49]  See Plaintiffs' Ex. 22-B.

**-29-**

FNFS was obtained through the use of a false financial statement must be denied.

Bankruptcy Code §523(a)(2)B) specifically provides that:

A discharge under section 727. . .of this title does not discharge an
individual debtor from any debt for money, property, services, or an
extension, renewal, or refinancing of credit, to the extent obtained by—
    use of a statement in writing–
        (i) that is materially false;
        (ii) respecting the debtor's or an insider's financial condition;
        (iii) on which the creditor to whom the debtor is liable for such
            money, property, services, or credit reasonably relied; and
        (iv) that the debtor caused to be made or published with intent to
            deceive.

11 U.S.C. § 523(a)(2)(B).

A financial statement is "materially false if it paints a substantially untruthful

picture of a financial condition by misrepresenting information of the type which would

normally affect the decision to grant credit." *First Nat'l Bank of Byers v. Slonaker (In re

Slonaker)*, 269 B.R. 595, 603 (Bankr. N.D. Tex. 2001) *citing Jordan v. Southeast Nat'l

Bank (In re Jordan)*, 927 F.2d 221, 224 (5th Cir. 1991).  A creditor's reliance upon

information in a financial statement must be judged in the totality of the circumstances.

Among the factors to be evaluated are: (1) whether there were previous business dealings

with the debtor that gave rise to a relationship of trust; (2) whether there were any "red

flags" that would have alerted an ordinarily prudent lender to the possibility that the

representations relied upon were not accurate; and (3) whether even a minimal

investigation would have revealed the inaccuracy of the debtor's representations.  *See Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir. 1993) (*en banc*).

Several facts bar the Plaintiffs' entitlement to a remedy under §523(a)(2)(B). Harwood's initial entitlement to withdraw funds from FNFS was not literally a credit decision.  It was not based upon any presentation of a financial statement.  It was not based upon any evaluation of credit standards by either Plaintiff.  Thus, this is not a typical §523(a)(2)(B) circumstance.  The Plaintiffs instead argue that Harwood's subsequent representations to the outside auditor of FNFS contained false written statements about the secured status of the Harwood promissory notes  – false statements that prevented the auditor from raising any issue about the collateral and, so the Plaintiffs contend, an action by the auditor would have prompted the board to block Harwood's credit access at an earlier time.

That contention fails on a number of levels.[50]  First of all, the statements did not deal directly with the Debtor's financial condition.  They dealt instead with the Plaintiffs' security position and the likelihood that the two promissory notes could be collected.  In support of their contentions under this subsection, the Plaintiffs introduced the confirmation letters tendered by Harwood to the auditors in February 2004 and February 2005 in which Harwood was asked to confirm that the master note was collateralized by

---

[50]  The Court acknowledges that, under the right circumstances, a false statement to a third party can become the basis of a §523(a)(2)(B) complaint if the party making the statement knows, or has reason to know, that the credit issuer will be relying upon that statement to the third party.

"stock" and that the Frazier property note was collateralized by "deed/stock."[51]   Though

the auditor, Jeff Geese, testified that a collateral evaluation was critical to the evaluation

of the nature and risk presented by the notes receivable, the inquiry to Harwood did not

even ask whether the Frazier deed of trust was recorded.  It simply asked for confirmation

of the note balances, the paid interest, and the <u>description</u> of collateral.  The Plaintiffs

contend that they were misled because the deed of trust pertaining to the master note was

omitted.  However, that omission, which reflects Harwood's contention that such deed of

trust was released earlier, failed to raise any concern by the auditor who had conducted

earlier audits in earlier years, and it could not have misled the board because the board

already knew that the deed of trust had existed in former years.  Thus, as a matter of

extending credit, there could not have been any justifiable reliance by the Plaintiffs upon

the asserted omission.  Further, based upon the totality of the evidence, the contention that

the board would have acted against Harwood in any event prior to September 2004 is

simply not credible.

*Nondischargeability under § 523(a)(4)*:  *Debt Arising From Fraud or Defalcation*
*in Fiduciary Capacity*.

The final exception to discharge proffered by the Plaintiffs' complaint is

§523(a)(4).  It provides that a discharge under §727 of the Bankruptcy Code does not

discharge an individual debtor from any debt "for fraud or defalcation while acting in a

---

[51]  Plaintiffs' Ex. 22-B.

fiduciary capacity, embezzlement, or larceny." 11 U.S.C. §523(a)(4). The Plaintiffs do

not allege fraud in this context, nor do they allege the existence of the quasi-criminal

activity encompassed by the latter two categories. Instead they allege that the

indebtedness owed by Harwood to B&W and FNFS, respectively, should be excepted

from discharge because it constitutes a defalcation by an individual acting in a fiduciary

capacity.

Whether the actions of an individual were taken in a fiduciary capacity for the

purposes of §523(a)(4) is determined by federal law, *DT Credit Corp. v. Brock (In re*

*Brock)*, 2008 WL 2954621 *7 (Bankr. E.D. Tex., July 31, 2008), although "state law is

important in determining whether or not a trust obligation exists." *Gupta v. Eastern*

*Idaho Tumor Institute, Inc. (In re Gupta)*, 394 F.3d 347, 350 (5th Cir. 2004). In *Texas*

*Lottery Comm'n v. Tran (In re Tran),* 151 F.3d 339 (5th Cir. 1998), the Fifth Circuit

explained the concept in the following terms:

> Under §523(a)(4), "fiduciary" is limited to instances involving express or
> technical trusts. The purported trustee's duties must, therefore, arise
> independent of any contractual obligation. The trustee's obligations,
> moreover, must have been imposed prior to, rather than by virtue of, any
> claimed misappropriation or wrong. Constructive trusts or trusts *ex*
> *malificio* thus also fall short of the requirements of §523(a)(4).
>
> Statutory trusts, by contrast, can satisfy the dictates of §523(a)(4). It is not
> enough, however, that a statute purports to create a trust: A state cannot
> magically transform ordinary agents, contractors, or sellers into fiduciaries
> by the simple incantation of the terms "trust" or "fiduciary." Rather, to

> meet the requirements of §523(a)(4), a statutory trust must (1) include a
> definable res and (2) impose "trust-like" duties.

*Id.* at 342-43.  Thus, "the requisite fiduciary relationship must exist under relevant law

prior to the creation of, and without reference to, the indebtedness in question.  *Brock,*

2008 WL 2954621 at *8, *citing Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1338 (5th

Cir. 1980).

However, the Fifth Circuit recognizes that the "technical" or "express" trust

requirement is not limited to trusts that arise by virtue of a formal trust agreement, but

includes relationships in which trust-type obligations are imposed pursuant to statute or

common law." *LSP Inv. Partnership v. Bennett (In re Bennett)*, 898 F.2d 779, 784-85 (5th

Cir.), *cert. denied*, 510 U.S. 1011, 114 S.Ct. 601, 126 L.Ed.2d 566 (1993).  For example,

Texas law clearly provides that a corporate officer owes a fiduciary duty to the

corporation.  *See, e.g., Moreno v. Ashworth (In re Moreno)*, 892 F.2d 417, 421 (5th Cir.

1990) ["This duty encompassed, at least, a responsibility not to lend [the corporation's]

money to himself or corporations controlled by him on less than an arms-length basis."].

*See also*, *Star High Yield Inv. Mgmt. Corp., Inc. v. Schwartz (In re Schwartz)*, 2008 WL

3285770 at *5 (Bankr. S.D. Tex., Aug. 7, 2008) ["Corporate officers owe fiduciary duties

to the corporations they serve and they are without authority to act in any manner in

which their interests are adverse to that of the corporation."], *citing* 15 TEX. JUR.3d

*Corporations* §283 (2007) and cases cited therein.  Thus, as the Fifth Circuit recognized

in *Gupta*:

> . . . debts arising from misappropriation by persons serving in a traditional, pre-existing fiduciary capacity, as understood by state law principles, are non-dischargeable.  Thus, debts of corporate officers to the corporation or a minority shareholder have been held non-dischargeable . . . .

394 F.3d at 350.

As to the second element, a defalcation is a willful neglect of duty.  Thus, it is "a lesser standard than fraud and . . . does not require actual intent, as does fraud." *Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 185 (5th Cir. 1997).  "While defalcation may not require an actual intent, it does require some level of mental culpability."  *Id*.  Willful neglect reflects "essentially a recklessness standard . . . which is measured objectively by reference to what a reasonable person in the debtor's position knew or reasonably should have known."  *Office of Thrift Supervision v. Felt (In re Felt)*, 255 F.3d 220, 226 (5th Cir. 2001).[52]  "Thus, "[b]ecause willfulness is evaluated objectively, it charges the debtor with knowledge of the law without regard to an analysis of his actual intent or motive" and, accordingly, "the fiduciary is presumed to know his legal obligations."  *Brock,*  2008 WL 2954621 at *8, *citing Felt*, 255 F.3d at 226-27.  Harwood does not dispute that, as its chief operating officer, he owed a fiduciary duty to

---

[52] "This definition was based in part on *United States v. Boyle* [469 U.S. 241 (1985)] in which the Supreme Court defined "willful neglect" in a statute regarding the penalty for late filing of estate tax returns as a "conscious, intentional failure or reckless indifference."  *Andrews v. Wells (In re Andrews)*, 368 B.R. 506, 513 (Bankr. M.D. La. 2006).

B&W Finance Co., Inc.[53]  He disputes any such obligation to FNFS.

## Was Harwood a fiduciary of FNFS?

Though Harwood does not dispute that, as its chief operating officer, he owed a fiduciary duty to B&W Finance Co., Inc., he vigorously contends that the §523(a)(4) exception to discharge cannot be applied to his indebtedness to FNFS, Ltd. because he owed a fiduciary duty only to B&W as the corporate general partner,[54] and not to the limited partnership that the corporate general partner managed under his direct control.[55]

---

[53]  *See, e.g., Moreno v. Ashworth (In re Moreno)*, 892 F.2d 417 (5th Cir. 1990).

[54]  It would seem undeniable that, by allowing its president to invade the treasury of FNFS at his whim and caprice, B&W, as the corporate general partner of the limited partnership, violated its fiduciary duty to FNFS, even though FNFS has sought no legal redress for that violation.  Harwood failed in the capacity of a corporate officer to comport himself in a manner consistent with his fiduciary duty to properly govern the corporation, including those duties as the sole general partner of a limited partnership entity.  Only he controlled the day-to-day actions of the general partner as to FNFS and the corporation failed to properly supervise the conduct of those actions.  Thus, B&W undoubtedly failed in its duty to FNFS by failing to control the actions of its own officers.  However, without any party seeking a formal finding that B&W itself committed a tort against FNFS, such an omission precludes any assessment of liability against Harwood under the Texas line of authority that a corporate officer's knowing participation in a tortious act of the corporation subjects him to personal liability to third parties without the necessity of piercing the corporate veil.  *See, e.g., Commercial Escrow Co. v. Rockport Rebel, Inc.,* 778 S.W.2d 532, 541 (Tex. App. – Corpus Christi 1989, writ denied); *Grierson v. Parker Energy Partners,* 737 S.W.2d 375, 377-78 (Tex. App. – Houston [14th Dist.] 1987, no writ); *7547 Partners v. Fistek*, 114 F.3d 1183 (5th Cir. 1997).

[55]  Contrary to the contentions of the Plaintiffs, this issue was not determined by the pleadings.  Although judicial admissions can be binding upon a party in a proper context and although it is undoubtedly true that Harwood "admitted the allegations contained in Paragraph 5" of both the Plaintiffs' original and first amended complaint, each containing an allegation that Harwood owed a fiduciary duty to both B&W and FNFS, *see* Defendant's Original Answer filed on October 13, 2005 (dkt #3) ¶ 5 at p. 2 and Defendant's First Amended Answer filed on February 6, 2007 (dkt #22) ¶ 5 at p. 2 , it is clear that Harwood was contesting the existence of any fiduciary duty owed by him to FNFS both in the pre-trial order and at trial.  The joint pre-trial order omitted any reference to such a fiduciary duty in its "Agreed Facts" section and it repeatedly referenced the Defendant's contention that he owed no fiduciary duty to FNFS in the "Disputed Facts" section.  As noted earlier, the pre-trial order controls over the earlier pleadings.  *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474, 127 S.Ct. 1397, 1409, 167 L.Ed.2d

Essentially Harwood claims that his transactions with FNFS may not be construed any differently from any action he might have otherwise taken toward any independent third-party entity.

While the use of multi-tiered organizational structures may have formerly provided an absolute shield to individuals seeking protection from liability to subsidiary entities, strict adherence to that standard has eroded as the expanding use of entities, rather than individuals, as general partners has forced courts to engage in a closer examination of the responsibilities imposed upon, and the protections granted to, those individuals whose actions and/or omissions directly determine the conduct of any entity serving as a general partner of a limited partnership.  Indeed, Texas courts have engaged in such examinations and have assessed liability for breach of fiduciary duty to a limited partnership and/or its limited partners against an individual serving as the managing partner of a general partnership that, in turn, acted as the general partner for that limited partnership,[56] as well as against an individual serving as the sole officer of a corporate general partner of a

---

190 (2007), *citing Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) ["When an issue is set forth in the pre-trial order, it is not necessary to amend previously-filed pleadings because the pre-trial order is the controlling document for trial."].  Thus, the "Defendant's Motion for Leave to Amend Answer to Plaintiff's First Amended Complaint," filed during an early phase of the trial when the Plaintiffs attempted to rely upon this "admitted fact" in its opening, was not really necessary.  However, as a matter of consistency, and because it is altogether clear that Harwood was contesting this issue at trial, the Court has granted his request for leave to correct this erroneous inconsistency in his operative pleading.

[56] *See Crenshaw v. Swenson*, 611 S.W.2d 886, 890 (Tex. Civ. App.– Austin 1980, writ ref'd n.r.e.) assessing liability in favor of the limited partners.

limited partnership.[57]

It is upon that foundation — rejecting the concept that an individual can escape the responsibilities of a fiduciary relationship merely by creating a two-tier organizational structure — that the Fifth Circuit subsequently held in *LSP Inv. Partnership v. Bennett (In re Bennett)*, 898 F.2d 779 (5th Cir.), *cert. denied*, 510 U.S. 1011, 114 S.Ct. 601, 126 L.Ed.2d 566 (1993), that not only does Texas law impose a fiduciary duty upon a managing partner of a limited partnership, but that it also imposes a fiduciary responsibility on the managing partner *of that managing partner* in a two-tiered limited partnership arrangement. The Circuit found that the trust-type obligations imposed by Texas law in each instance is sufficient to meet the "fiduciary capacity" requirements of §523(a)(4). In construing *Crenshaw v. Swenson* and its precursors, the Circuit in *Bennett* was convinced that Texas law would impose such fiduciary obligations upon individuals in the "second tier" when such individuals exercised a substantial degree of control and direction over the intermediary entity serving as the general partner to the limited partnership. As the Circuit observed:

> What this Court finds significant is the *Crenshaw* court's analysis of why the managing partner of the managing partner in that case owed a fiduciary obligation to the underlying limited partners. In analyzing the duties that Ms. Swenson owed to the limited partners, the *Crenshaw* court focused on

---

[57] *See Remenchik v. Whittington*, 757 S.W.2d 836 (Tex. App .– Houston [14th Dist.] 1988, no writ) assessing liability in favor of the limited partners and the limited partnership itself against the officer of a corporate general partner since such officer "directed and participated in the tortious wrongdoings of [the corporate general partner]." *Id.* at 839.

the nature of the business relationship as a whole, in which one person . . .
exercised almost total control over the project.  This high level of control,
over the project and the limited partners' investments, appears to have been
critical in persuading the *Crenshaw* court that Ms. Swenson owed a
fiduciary duty to the limited partners.

*Id.* at 789.

As a result of the control exercised by the debtor Bennett, who was the sole
general partner of a limited partnership that, in turn, acted as the general partner for the
affected limited partnership, the Circuit found that Bennett, as the sole individual with the
power and authority to direct the affairs of the titular managing general partner of the
limited partnership, owed a fiduciary duty under Texas law to the limited partners
sufficient to meet the requirements of §523(a)(4).  It thus expressly overruled a
bankruptcy court decision in favor of Bennett based upon the legal conclusion that only
the named managing general partner (the "first tier") could have a fiduciary duty to the
limited partnership and expressly rejected the "two-tier" protection argument when an
individual on the second tier maintains substantial control of the actions of the named
general partner.

That analysis remains sound.  As articulated by one court in its subsequent
adoption of the *Bennett* and *Crenshaw* analysis:

Holding that second-tier general partners are not fiduciaries of first-tier
limited partnerships would invite attempts to evade partnership duties and
liability.  A general partner-to-be could add a second partnership "layer"
consisting of himself or herself and a phantom limited partner simply to

insulate himself or herself from a potential nondischargeability

determination while maintaining the same level of control.

*Abrams v. Sea Palms Associates, Ltd. (In re Abrams)*, 229 B.R. 784, 792 (B.A.P. 9th Cir.

1999, *aff'd,* 242 F.3d 380 (9th Cir. 2000).

Harwood contends that the foregoing analysis regarding the existence of a

fiduciary capacity is inapplicable when the named general partner of the affected limited

partnership is a corporation and the debtor is merely a single officer or director among

many.[58]   Admittedly the Court has found no controlling authority precisely on point

concerning the duty of the operational officer of a corporate general partner toward a

limited partnership.   However, the United States Bankruptcy Court for the Northern

District of Oklahoma has imposed a fiduciary duty upon a corporate president under

similar circumstances who tried to utilize his corporation as a shield against personal

liability to a limited partnership.   In *Park v. Moorad (In re Moorad)*, 132 B.R. 58 (Bankr.

N. D. Okla. 1991), the Court stated:

---

[58]   Harwood cites the Court to the discussion in *Grierson v. Parker Energy Partners*, 737 S.W.2d 375 (Tex. App. – Houston [14th Dist.] 1987, no writ), in which the 14th District Court of Appeals considered whether the allegations and proof presented in that case were sufficient to put a corporate president on proper notice of certain damage claims and whether a default judgment could thereby be sustained against that corporate officer based on such claims.  In its evaluation, the *Grierson* court repeated some general concepts about the protection normally afforded to corporate officers, including the general observation that corporate officers normally owe no duty to third persons.  However, it does not address the problems discussed in *Crenshaw* and *Bennett.*  Further, *Grierson* itself recognizes that such protection can be forfeited by a corporate officer even to a third party if that officer knowingly participates in a tortious or fraudulent act.  According to *Grierson*, in light of the fact that breach of a fiduciary duty is a tort under Texas law, any corporate officer who knowingly participates in his corporation's breach of a fiduciary duty to a limited partnership can be held personally liable.  *Id.* at 378.  Thus, any second-tier protection from liability to a limited partnership enjoyed by an officer of a corporate general partner is far from absolute. *Accord, 900 Capital Services, Inc. v. Cloud, (In re Cloud)*, 214 F.3d 1350, at *3 (5th Cir. 2000).

-40-

The [individual] Debtor's defense is that MMI, a corporation, was the
general partner of TDIC [a limited partnership]; thus, corporate law
principles protect him from individual liability.  The Court, however, will
not allow the Debtor to hide beneath a corporate shell when he so
completely controlled the corporate actions, representations, and decisions
that in effect it had no life without him.

*Id.* at 62-63.  The Court further notes that the premise that officers of corporate general

partners owe a fiduciary duty to limited partners is given credence in *West v. Seiffert (In*

*re Houston Drywall, Inc.)*, 2008 WL 2754526 (Bankr. S.D. Tex., July 10, 2008), at *33,

n.41 [surmising that the degree of control exercised by officers of a corporate general

partner creates a fiduciary duty to limited partners].

Accordingly, this Court finds the *Bennett* analysis to be compelling in this

corporate circumstance as well.  To do otherwise elevates form over substance.  The

relevant issue should not be the choice of organizational form, nor the numerosity of

warm bodies available to blame in a corporate setting, but rather an analysis of whether

the degree of control actually exercised by a corporate officer over the actions of a

corporate general partner warrants a corresponding recognition of the fiduciary

responsibilities realistically assumed by that individual as to an affected limited

partnership entity.  Simply stated, with control comes responsibility, and that principle is

no less applicable to corporate officers controlling the actions of an inanimate corporation

as a general partner of a limited partnership than it is when fiduciary duties of second-tier

managing partners are recognized in a partnership setting.

In applying that standard in this case, Harwood clearly stood in a fiduciary capacity in his relationship to FNFS.  He was in control of the day-to-day activities of B&W and FNFS in an almost autocratic fashion.  No one with daily involvement in either company's affairs could realistically challenge Harwood's authority or decision-making with regard to either entity.  It was in that unrestrained atmosphere that Harwood began to demand, on an increasingly frequent basis,[59] that FNFS funds be tendered to him, often without explanation, and those directives were immediately implemented by the office staff without question and without ultimate inquiry or interference by the B&W Board of Directors.

*Was there a defalcation by Harwood?*

Though the degree of control exercised by Harwood over these entities is sufficient to impose a fiduciary obligation upon him in relation to both B&W and FNFS, the existence of that obligation is not singularly sufficient to establish a nondischargeable debt under §523(a)(4).  The Plaintiffs cannot reach that result without establishing a defalcation by Harwood as to the various components of his indebtedness.

With regard to the various categories of allegedly improper business expenses or expense reimbursements taken through the years by Harwood, the Plaintiffs have failed to prove that there was any defalcation of funds by Harwood from either entity as it pertains

---

[59]  By the time B&W terminated Harwood's employment, there were seventy-three (73) different "draws" or checks taken by Harwood from FNFS funds.

expense reimbursements.  As noted earlier, the expense reimbursements received by

Harwood, including any payment for rentals of the Arp Property to the corporation and/or

his delineation of expenses purportedly incurred in the course of the business, including

the American Express and Chevron credit card expenditures,[60] the 1-11-01 mileage

reimbursement, and the airplane expenses, do not inherently constitute a willful neglect of

duty.  Harwood defended the legitimacy of the characterization of those expenditures as

business expenses and the Plaintiffs offered insufficient evidence to force a reversal of

that characterization.  Further, the evidence demonstrates that the process of accounting

for those expenses remained unchanged for a number of years within the organization,

that the Board of Directors had repeatedly approved those expenditures as business

expenses with little or no review, and even a hostile witness like Kathy Mallory

confirmed that, in all her years dealing with accounting matters at B&W, she never

received a single inquiry from any board member about the legitimacy of Harwood's

expense reimbursements, despite her unexpressed concerns about them.  Thus, the

Plaintiffs have failed to sustain their burden of proof to demonstrate by a preponderance

of the evidence that the payment of those expenditures were inappropriate or otherwise

---

[60]  Recovery of the AMEX reimbursements was sought by FNFS, but it seems that such expenses could more properly be described as a B&W reimbursement, since the AMEX account was technically in the name of a predecessor corporation, First National Financial Services, Inc.  See Plaintiffs' Ex. 46. Regardless of how those expenses should have been booked, they are not nondischargeable under §523(a)(4).

constituted a defalcation of Harwood's fiduciary duty either to B&W or to FNFS.[61]

As to the payments to Sherry Harwood for non-existent work, there was clearly a defalcation of Harwood's fiduciary duty to B&W.  In fact, one could properly characterize his actions in this regard in far more culpable terms than a defalcation. Harwood falsified a consultant's role for his wife that never existed and he ultimately implemented a system whereby he did not even require the signature of his wife in order to bank this personal income purportedly attributable to her efforts.  B&W has adequately established that no Board authority for this "employment" arrangement was ever sought nor received, and the general malaise that otherwise characterized the activity of the board members in this corporation for a number of years, whether engendered by Wayne McKinney or not, cannot constitute a ratification of this particular action.[62]  However, the availability of that information precludes any protection for B&W under the discovery rule and renders any amounts owing to B&W subject to the applicable four-year statute of limitations which was properly pled by the Defendant.  Thus, only those amounts paid to Harwood after June 7, 2001 are recoverable by B&W and such indebtedness totaling $36,100 is hereby declared non-dischargeable pursuant to §523(a)(4).

The Court now turns to the dischargeability of the indebtedness owed by Harwood

---

[61]  Though it has obviously taken due note of the Board's inactivity and/or acquiescence in this regard, the Court need not technically reach, therefore, the affirmative defense of ratification proffered by Harwood as to the expense reimbursements.

[62]  *See infra* note 63.

-44-

to FNFS as evidenced by the two promissory notes. Despite the fact that Harwood acted in a fiduciary capacity toward FNFS, and while some of his actions or motivations in the creation and expansion of the liabilities reflected by these notes may seem audacious to a reasonable person, audacity alone does not equate to a defalcation. Did the mere existence of these debts to FNFS constitute a willful neglect of duty? Hardly. Indeed, the indebtedness cannot be fairly described as a misappropriation and the debt was not created surreptitiously. Harwood brought his lending expertise to bear by executing two promissory notes to FNFS to evidence the indebtedness. Most, if not all, interested parties knew of the existence of the indebtedness, even if they were unaware of the growing balance of the debt or were unable to identify all of the purposes for such withdrawals were taken. Harwood's failure to place a manageable (i.e., collectible) ceiling on that indebtedness to his implied beneficiary could be deemed a credible consideration in determining whether his actions or omissions rise to the level of a defalcation, although the Plaintiffs' evidence on that point establishes a level of culpability by Harwood no greater than negligence, and this Court agrees that a mere negligent breach of a fiduciary duty is insufficient to constitute a defalcation for purposes of §523(a)(4). *Meyer v. Rigdon*, 36 F.3d 1375, 1384-85 (7th Cir. 1994); *FDIC v. Gaubert (In re Gaubert)*, 149 B.R. 819, 827 (Bankr. E.D. Tex. 1992). However, there is one additional set of omissions by Harwood pertaining to the promissory notes that warrants discussion.

Harwood is an intelligent, sophisticated Texas banker.  At all times relevant to this dispute, he absolutely knew the ramifications of any failure to properly record a deed of trust on real property under Texas law.  He absolutely knew or had reason to know that he would personally benefit from any failure by FNFS to record the deeds of trust in its favor since he could use (and subsequently did use) the unencumbered nature of those properties to obtain access to additional funds from other financial institutions.  He absolutely knew or had reason to know the devastating effect which that omission would have on any subsequent collection effort by FNFS, and that such a risk to FNFS grew in proportion to the escalating balance of the sums that he personally borrowed from that entity.  That risk was further magnified as FNFS experienced greater financial difficulties through succeeding years.

Even if one chooses to accept Harwood's contention that possession of the deeds of trust was tendered to Wayne McKinney and that McKinney had complete knowledge regarding the status of the FNFS collateral (which seems dubious), Harwood knew that McKinney had no particular knowledge regarding sound lending practices.  McKinney was not the banking specialist in this operation.  That was Harwood's area of responsibility to this entity.  He was brought into this finance business because of his banking expertise.  He was specifically in charge of day-to-day operations because of that expertise.  Yet, with regard to the actions which Harwood knew had to be taken in order to ensure that FNFS held a rightful first-lien position as to the collateralized properties,

-46-

thereby preserving, at the very least, a degree of protection for FNFS in the face of increasing economic difficulties and increasing note balances, Harwood neglected his duty.

In light of his fiduciary duty to protect FNFS from financial harm, Harwood had an affirmative duty to ensure that the deeds of trust collateralizing his obligations to the company were properly recorded. In light of his fiduciary duty to protect FNFS from financial harm, Harwood's failure to ensure the proper recordation of the deeds of trust was reckless. In light of his fiduciary duty to protect FNFS from financial harm, and in light of his knowledge that he would personally benefit from any failure of recordation, Harwood's failure to ensure the proper recordation of the deeds of trust constituted a willful neglect of his duty to FNFS. That failure constitutes a defalcation while acting in a fiduciary capacity and renders Harwood's indebtedness to FNFS on the Master Note and his remaining indebtedness to FNFS on the Frazier Note, plus the Plaintiffs' reasonable attorneys' fees, nondischargeable under §523(a)(4).[63]

*Requests for Ancillary Relief*

---

[63] The Court rejects Harwood's contention that any breach of fiduciary duty to FNFS was ratified by the B&W board of directors. Under Texas law, there can be no ratification of an act that is not done on behalf of the corporation but rather is performed for the sole benefit of the fiduciary. *See, e.g., Enserch Corp. v. Rebich*, 925 S.W.2d 75, 84 (Tex. App. – Tyler 1996, writ dism'd); *Gen. Dynamics v. Torres*, 915 S.W.2d 45, 50 (Tex. App.– El Paso 1995, writ denied); *Spangler v. Jones*, 861 S.W.2d 392, 396 (Tex. App. – Dallas 1993, writ denied) (en banc); *Rhodes, Inc. v. Duncan*, 623 S.W.2d 741, 744 (Tex. App. – Houston [1st Dist.] 1981, no writ); *Herider Farms-El Paso, Inc. v. Criswell*, 519 S.W.2d 473, 477 (Tex. Civ. App. – El Paso 1975, writ ref'd n.r.e.); *Coffey v. Ft. Wayne Pools, Inc.*, 24 F.Supp.2d 671, 683 (N.D. Tex. 1998).

FNFS asks for a determination as to the validity of its deed of trust lien upon the

Arp Property[64] or, alternatively, asks the Court to impose a constructive trust or an

equitable lien upon the Arp Property.  Harwood contends that the Arp Property does not

stand as security for payment of the Master Note primarily because his unilateral

preparation and execution of the 2003 renewal and extension of the Master Note,[65] as

distinguished from its earlier counterparts,[66] did not specifically reference the Arp

Property as collateral for that note.

Without reference to the amount of value actually protected by its lien, it is

unnecessary for the Court to impose a constructive trust[67] or an equitable lien[68] upon the

Arp Property because FNFS has a valid, subsisting deed of trust upon that 20-acre tract.[69]

---

[64]  Plaintiffs' Ex. 1-C.

[65]  Plaintiffs' Ex 1.

[66]  See Plaintiffs' Ex. 1-C (deed of trust AND note) and 1-A (2000 note).

[67]  A constructive trust is an equitable remedy created by the courts to prevent unjust enrichment. *Holmes v. Kent*, 221 S.W.3d 622, 628 (Tex.2007).  Since there is a valid lien in favor of FNFS, there is no unjust enrichment of Harwood which requires correction.

[68]  An equitable lien is not an estate in the thing to which it attaches, but merely an encumbrance against the property to satisfy a debt. *Karigan v. Karigan,* 239 S.W.3d 436, 439 (Tex. App. – Dallas 2007, no pet.).  Its function is to enforce a purchase money obligation not otherwise secured. *White, Smith & Baldwin  v. Downs*, 40 Tex. 225, 226 (1874).  Since the Master Note in this instance is secured by a deed of trust in favor of FNFS, the imposition of such a lien would serve no true function.  *GXG, Inc. v. Texacal Oil & Gas*, 977 S.W.2d 403, 427 (Tex. App.– Corpus Christi 1998, pet. denied).

[69]  Since the lien upon the Arp Property granted by Harwood through the deed of trust clearly predates any homestead claim made by Harwood, the lien held by FNFS is superior to any such homestead claim.  *Inwood North Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 635 (Tex.1987) ["It has long been held that an encumbrance existing against property cannot be affected by the subsequent impression of the homestead exception on the land."], *citing Farmer v. Simpson*, 6 Tex. 303, 310 (1851); *Gage v. Neblett*, 57 Tex. 374, 378 (1882); *see also, Dominguez v. Castaneda*, 63 S.W.3d 318, 331 (Tex. App. – El Paso 2005, pet. denied).

The fact that the deed of trust to the Arp Property is unrecorded is irrelevant to the rights of FNFS vis-a-vis Harwood.  "[I]t is a well-reasoned rule of law that neither the acknowledgment nor recordation of a deed of trust is necessary to make it a valid and binding obligation between the immediate parties thereto. Also, the proper statutory recording of such deed of trust is not essential for the conveyance of the title to the real property therein." *Denson v. First Bank & Trust of Cleveland,* 728 S.W.2d 876, 877 (Tex. App.– Beaumont 1987, no writ) and cases cited therein.  This rule of law is codified in the Texas Property Code:

§13.001.  Validity of Unrecorded Instrument

> (a) A conveyance of real property or an interest in real property or a mortgage or deed of trust is void as to a creditor or to a subsequent purchaser for a valuable consideration without notice unless the instrument has been acknowledged, sworn to, or proved and filed for record as required by law.[70]

> (b) *The unrecorded instrument is binding on a party to the instrument*, on the party's heirs, and on a subsequent purchaser who does not pay a valuable consideration or who has notice of the instrument. . . .

1 TEX. PROP. CODE ANN. §13.001 ( Vernon 2004) (emphasis added).

Neither did the omission of any reference to the deed of trust in the 2003

---

[70] Thus, it would appear that FNFS' deed of trust would be junior to the recorded interests Capital One Bank (née Hibernia).

promissory note extension and renewal have any legitimate effect on the validity of the lien. A mortgage or deed of trust lien is extinguished or discharged under Texas law by: (1) payment of the underlying indebtedness,[71] (2) other tender of the amount of the mortgage debt,[72] or (3) by any other satisfaction of the note which the lien has been given to secure.[73] There is no evidence in the record that any of those events have occurred and Harwood's uncorroborated and self-serving testimony regarding the gratuitous release of the lien upon the Arp Property by FNFS is insufficient to evidence any such occurrence. Indeed the evidence establishes that FNFS intended to retain that security, particularly in light of the increasing amount of the Harwood indebtedness. Thus, the validity of the deed of trust held by FNFS as to the Arp Property is confirmed.

The Court further awards attorneys' fees to FNFS based upon the operative provisions of the promissory notes issued by Harwood.[74] Texas law provides that a party may recover reasonable attorney's fees on a claim based on an oral or written contract by complying with the following requirements: (1) the claimant must be represented by an

---

[71] *See, e.g., First Nat. Bank of Houston v. Ackerman*, 70 Tex. 315, 320, 8 S.W. 45, 47 (1888); *Knox v. Farmers' State Bank*, 7 S.W.2d 918 (Tex. Civ. App. – Eastland 1928, writ ref'd), *citing Mickie v. McGehee*, 27 Tex. 134 (1863); *Ponderosa Development, L.P. v. Craig (In re Ponderosa Development, L.P.)*, 2007 WL 1556866 at *3 (Bankr. E.D. Tex. 2007).

[72] *See, e.g.*, *Lillienstern v. First Nat. Bank*, 288 S.W. 477, 478-79 (Tex. Civ. App. – Texarkana 1926, no writ).

[73] *See, e.g.*, *Cromeens v. Arnold Cotton Co.*, 461 S.W.2d 505, 510 (Tex. Civ. App. – Tyler 1970, writ ref'd n.r.e.); *Heidenheimer v. Higginbotham-Bartlett Co.*, 53 S.W.2d 644, 646 (Tex. Civ. App. – Amarillo 1932, writ ref'd).

[74] See ¶ 5 of Plaintiffs' Ex. 1 and 2, respectively.

attorney; (2) the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party; and (3) payment for the just amount owed must not have been tendered within thirty days of presentment.  TEX. CIV. PRAC. & REM. CODE ANN. § 38.002 (Vernon 1997).  No particular form of presentment is required, and it may be written or oral.  *See Harrison v. Gemdrill Intern., Inc.*, 981 S.W.2d 714, 719 (Tex.App.– Houston [1st Dist.] 1998, pet. denied) ["[A]ll that is necessary is that a party show that its assertion of a debt or claim and a request for compliance was made to the opposing party, and the opposing party refused to pay the claim."].  Proper presentment of the claim was demonstrated in this case.[75]  Accordingly, FNFS is entitled to recover attorneys' fees in the amount of $82,904.00, with an additional recovery of $20,000 in the event of an appeal to the United States District Court and a recovery of an additional $20,000 in the event of an appeal to the United States Court of Appeals to the Fifth Circuit.

*Plaintiffs' Objections to Debtor's Claims of Exemption*

Consolidated for hearing purposes with the trial of the Plaintiffs' adversary complaint was the Plaintiffs' Amended Objections to Exemptions filed on November 13, 2006, filed in response to the filing of the Debtor's Amended Schedule C on October 12, 2006.  The amended objections contest the validity of Harwood's homestead claim upon the 20-acre Arp Property and its improvements, as well as challenging a number of

---

[75]  See Plaintiffs' Ex. 71.

Harwood's personal property exemption claims.  Since the Debtor selected Texas exemptions, the Court will look to Texas law in assessing the validity of the Debtor's exemption claims.  *Bradley v. Pacific Southwest Bank (In re Bradley)*, 121 B.R. 306, 312 (Bankr. N.D. Tex. 1990), *rev'd on other grounds*, *In re Bradley*, 960 F.2d 502 (5th Cir. 1992), *cert. denied sub. nom.*, *Commonwealth Land Title Ins. Co. v. Bradley*, 507 U.S. 971, 113 S.Ct. 1412, 122 L.Ed.2d 783 (1993); *see also In re Moody,* 77 B.R. 580, 590 (S.D. Tex. 1987) ["Bankruptcy courts must resort to state law for an interpretation of state exemption rights in homesteads."], *aff'd*, *In re Moody*, 862 F.2d 1194 (5th Cir.), *cert. denied*, *Moody v. Smith*, 503 U.S. 960, 112 S.Ct. 1562, 118 L.Ed.2d 209 (1992).

The Debtor asserted a homestead exemption claim as to the 20-acre Arp Property and the improvements situated thereon, including the residence, cabin and gymnasium, and the Debtor noted a fair market value for the entire property of $695,000.  This exemption claim, if allowed, protects a debtor's homestead from seizure for the claims of creditors, except for encumbrances which are "properly fixed" on the homestead property.[76]  In their objection to Harwood's homestead claim, the Plaintiffs essentially assert that the Arp Property does not qualify under the Texas Constitution[77] or the Texas

---

[76]  TEX. PROP. CODE §41.001(a) states that "[a] homestead . . . [is] exempt from seizure for the claims of creditors except for encumbrances properly fixed on homestead property."  The statute then proceeds to describe those encumbrances which may be "properly fixed on homestead property."  *See* TEX. PROP. CODE §41.001(b).

[77]The pertinent part of the Texas Constitution states that:

The homestead, not in a town or city, shall consist of not more than two hundred acres of land, which may be in one or more parcels, with the improvements thereon; the

Property Code[78] as a homestead.  It is widely recognized, of course, that Texas courts have always liberally construed any claimed homestead exemption.  *Woods v. Alvarado State Bank*, 19 S.W.2d 35 (Tex. 1929) ["The rule that homestead laws are to be liberally construed to effectuate their beneficent purpose is one of general acceptation."] (*citing Trawick v. Harris*, 8 Tex. 312 (Tex. 1852)); *In re Mitchell*, 132 B.R. 553, 557 (Bankr. W.D. Tex. 1991).

Although the party objecting to the homestead exemption has the ultimate burden of persuasion (or the risk of non-persuasion) pursuant to FED. R. BANKR. P. 4003(c), the

---

homestead in a city, town or village, shall consist of lot or contiguous lots amounting to not more than 10 acres of land, together with any improvements on the land; provided, that the homestead in a city, town or village shall be used for the purposes of a home, or as both an urban home and a place to exercise a calling or business, of the homestead claimant, whether a single adult person, or the head of a family; provided also, that any temporary renting of the homestead shall not change the character of the same, when no other homestead has been acquired; provided further that a release or refinance of an existing lien against a homestead as to a part of the homestead does not create an additional burden on the part of the homestead property that is unreleased or subject to the refinance, and a new lien is not invalid only for that reason.

*See* 3 TEX. CONST. art. XVI, §51(amended 1999) (Vernon Supp. 2008).

[78]   The Debtor claimed the Arp Property as a rural homestead under §41.002(b)(1).  That provision provides that:

(a) If used for the purposes of an urban home or as both an urban home and a place to exercise a calling or business, the homestead of a family or a single, adult person, not otherwise entitled to a homestead, shall consist of not more than 10 acres of land which may be in one or more contiguous lots, together with any improvements thereon.

(b) If used for the purposes of a rural home, the homestead shall consist of:
(1) for a family, not more than 200 acres, which may be in one or more parcels, with the improvements thereon; or
(2) for a single, adult person, not otherwise entitled to a homestead, not more than 100 acres, which may be in one or more parcels, with the improvements thereon.

2 TEX. PROP. CODE ANN. §41.002(a), (b) (Vernon 2000).

debtor-claimant must sustain an initial burden of production or going forward with the evidence to establish that the referenced property qualifies for the exemption claimed before the objecting party is obligated to go forward with his proof.  This is consistent with Texas law in this area which requires any homestead claimant to prove that the property claimed as homestead actually qualifies for the homestead exemption.  *See, e.g., Perry v. Dearing (In re Perry),* 345 F.3d 303, 311 (5th Cir. 2003) ["The claimant has the initial burden of establishing homestead status."] (*citing Burk Royalty Co. v. Riley,* 475 S.W.2d 566, 568 (Tex. 1972)); *Bradley,* 960 F.2d at 507 ["It is well settled in Texas that an individual who seeks homestead protection has the initial burden to establish the homestead character of her property."] (*citing Lifemark Corp. v. Merritt,* 655 S.W.2d 310, 314 (Tex. App. –  Houston [14th Dist.] 1983, writ ref'd n.r.e.)); *Vaughn v. Vaughn*, 279 S.W.2d 427, 436 (Tex. Civ. App. – Texarkana 1955, writ ref'd n.r.e.) and cases cited therein.

Generally, in order to assert homestead rights in a particular property, a person must use the property as a home.  3 TEX. CONST. art. XVI, §51 (amended 1999) (Vernon Supp. 2008); 2 TEX. PROP. CODE ANN. §41.002(a), (b) (Vernon 2000). *See also Claflin*, 761 F.2d at 1091 ["the purpose of the homestead exemption laws is to protect the possession and enjoyment of the individual in property which is *used* as his or her home" (*emphasis added)*]; *Yates v. Home Bldg. & Loan Co*., 103 S.W.2d 1081, 1084-85 (Tex. Civ. App. – Beaumont 1937, no writ) ["Homestead rights in a house cannot be acquired

by mere intention, but to effectuate the intent actual use of the property as a home must concur."].

The evidence establishes that Harwood was residing on the Arp Property as of the Petition Date with the requisite intent and utilizing that property for the purposes of a home, following his divorce from Sherry Harwood.  Thus, Harwood has satisfied his burden to establish the homestead character of the property as of the Petition Date.  Since the Plaintiffs made no evidentiary attempt to show that any homestead right established by Harwood has been relinquished,[79] the objection filed by the Plaintiffs to the Debtor's homestead exemption claim pertaining to the Arp Property must be overruled.[80]

The Plaintiffs also object to a number of the personal property exemptions Harwood listed in his amended Schedule C.  As this Court stated in *In re Harrington*, 306 B.R. 172 (Bankr. E.D. Tex. 2003):

---

[79]  Once homestead rights have been established in certain property, that protected character can be lost in Texas only upon death, alienation, or abandonment.  *See U.S. v. Rodgers*, 461 U.S. 677, 685-86, 103 S.Ct. 2132, 2138, 76 L.Ed.2d 236 (1983); *Intertex, Inc. v. Kneisley*, 837 S.W.2d 136, 138 (Tex. App. – Houston [14th Dist.] 1992, writ ref'd) ["The Texas case law is clear that a homestead property loses its homestead protection [only] upon the death of the claimants, abandonment, or alienation by them."].  Moreover, a party asserting the termination of homestead rights must satisfy a very stringent burden of proof in order to prevail.  *See, e.g., regarding proof of abandonment, Estate of Montague v. National Loan Investors, L.P.*, 70 S.W.3d 242, 248 (Tex. App. — San Antonio 2001, pet denied). [requiring evidence to be *undeniably clear*]; *Taylor v. Mosty Bros. Nursery, Inc.*, 777 S.W.2d 568, 569 (Tex. App. — San Antonio 1989, no writ) [*clear, conclusive and undeniable evidence*]; *In re Estate of Casida,* 13 S.W.3d 519, 521-22 (Tex. App. — Beaumont 2000, no pet.) ["The party claiming abandonment must plead it and carry the burden of proving it.  *Said burden is a heavy one.*"] (emphasis added).

[80]  Thus, the Debtor has a valid homestead claim sufficient to take the Arp Property out of the scope of the bankruptcy estate.  However, it would appear valueless to Harwood, given the aggregate amount of indebtedness against the property, and it is ineffectual against the FNFS lien since such lien was granted prior to any homestead claim asserted by Harwood.  *See supra* note 69.

-55-

FED. R. BANKR. P. 4003(c) clearly and unequivocally places the ultimate burden of persuasion in any contested matter over the validity of a debtor's exemption claims upon the party objecting to a debtor's claimed exemptions.[81]  Although in the face of an objection this Court believes that a debtor must sustain a minimal burden of going forward with the evidence to establish that the referenced property qualifies for the particular exemption claimed before the objecting party is obligated to go forward with its proof, that burden is easily satisfied in most cases.  In fact, the assertion of the exemption claim itself has been found to be sufficient.  *See In re Patterson*, 128 B.R. 737, 740 (Bankr. W.D. Tex. 1991) ["Generally, it is the initial burden of the Debtor to establish the right to claim the exemption.  Apparently, all that the Debtor must do to support a *prima facie* case is to claim the property as exempt." (citations omitted)].  However, there is no disagreement that the ultimate burden of persuasion (or the risk of non-persuasion) always rests upon the objecting party under Rule 4003(c).  "The case law generally holds that once the debtor makes this *prima facie* showing, the burden shifts, and the ultimate burden of persuasion is on the objecting party to present evidence that the claim cannot be sustained under applicable local law."  *Id*.

*Id*. at 181-82.

The Court finds that Harwood has made the required *prima facie* showing regarding the categorization of his personal property exemption claims, including those items in his "Home Office/Gym."  Texas jurisprudence applies a liberal interpretation of these categories.  As this Court has explained in a prior unpublished opinion:

---

[81]  *See* FED. R. BANKR. P. 4003(c) ["In any hearing under this rule, the objecting party has the burden of proving that the exemptions are not properly claimed."].

There is no definition of "home furnishings" provided in the statute and there is little jurisprudence which construes the breadth of the statute. However, earlier decisions do generally agree that a broad interpretation is generally accorded to Texas exemption claims. In protecting a piano from forced sale by construing the language of a former exemption statute category of "all household and kitchen furniture," the Supreme Court of Texas stated that:

> The general definition of 'household,' when used as a qualifying word, is pertaining or belonging to the house or family, and it is so evidently used in the statute under consideration, the purpose of which is to exempt articles belonging to a family. And in such a connection, the word 'furniture' is one of very broad signification, and, according to lexicographers, *embraces a supply of necessary, convenient, or ornamental articles with which a residence is equipped.* The statute declares that 'the ordinary signification shall be applied to words . . . . Looking to the entire article giving the exemption, it is evident that the legislature did not intend to limit the exemptions to such things as are necessaries to a family.

*Alsup v. Jordan*, 69 Tex. 300, 304-05, 6 S.W. 831, 833 (1887)(citations omitted and emphasis added). A subsequent decision described the same exemption statute as given "to secure the necessities, comforts, and conveniences of the family in the home." *Mueller v. Richardson*, 82 Tex. 361, 364, 18 S.W. 693, 694 (1891).

If this general approach to the determination of the breadth of articles protected can be said to have changed over the years, it has only been broadened. The descriptive adjectives "household" and "kitchen"

-57-

have given way to "home," "furniture" has been supplanted by the broader term "furnishings,"[82] and the legislature has avoided the application of any test of reasonable necessity upon the scope of the protection. Thus, citizens of this State have historically exercised some degree of discretion in the selection of items that can be protected from seizure from their homes, subject to the statutory monetary limits imposed upon their exemption claims, and certainly it must be recognized that the list of items which may be protected will change over time. However, the consistent "purpose of the exemption is to pick up the sorts of items one might furnish one's house with." *In re Leva*, 96 B.R. 723, 738 (Bankr. W.D. Tex. 1989).

. . . Particularly when considered in light of the fact that a Texas debtor is relieved from any showing of necessity for any particular item under this category, and because a debtor's discretion in the protection of such items is limited by the aggregate value ceiling, the scope of this exemption should be construed liberally to encompass these enumerated items for the Debtor's "necessity, comfort or convenience."

*In re Herman,* "Memorandum of Decision," Chapter 7 Case No. 02-64085 - dkt #163 at pp. 4-7 (Bankr. E.D. Tex., Feb. 19, 2004).

The same liberality has been applied to the categorization of tractors and mowers as farming equipment. *See, e.g., PaineWebber, Inc. v. Murray (In re Murray)*, 260 B.R. 815, 832 (E.D. Tex. 2001) (J. Schell) [noting that "Section 42.002(a)(3) of the Texas Property Code clearly states that farming or ranching vehicles and implements are exempt. . . . [and] the court sees no reason to reject a literal interpretation of that

---

[82] A "furnishing" is commonly defined as "a piece of equipment necessary or useful for comfort or convenience." *See* THE AMERICAN HERITAGE DICTIONARY 540 (1982).

section."].  The evidence regarding the nature of the Arp Property is sufficient to meet Harwood's *prima facie* burden of entitlement as to the farming equipment.

Thus, all of the Debtor's exemption claims are entitled to *prima facie* validity with the noted exceptions of his photography and hobby equipment (excluding golf equipment) for which there is no personal property exemption under Texas law[83]   The Plaintiffs offered no evidence to contradict this  *prima facie* validity as to the categorization of the claims.

As to whether the Debtor has exceeded his $30,000 exemption allowance, his limited testimony as the owner regarding the value of those goods is sufficient to create a *prima facie* case regarding the validity of those asserted values.  The Plaintiffs produced some evidence to indicate that Harwood's valuations on his exemption claims are substantially less than the amount for which he collectively insured personal property under his homeowner's insurance policies over the past few years.[84]   However, the Plaintiffs offered no independent valuation evidence regarding those assets and the collective evidence is insufficient to allow the Court to assess the value of those challenged assets.  As the parties with the ultimate burden of persuasion regarding any dispute on value, FED. R. BANKR. P. 4003(c), it is incumbent upon the Plaintiffs to present evidence that the exemption claims cannot be sustained under applicable law and, as

---

[83]  The golf equipment qualifies for an exemption as sporting equipment.  2 TEX. PROP. CODE §42.002(a)(8) (Vernon 2002).

[84]  Plaintiffs' Ex. 67.

Judge Donald Sharp once succinctly put it:

> Under Bankruptcy Rule 4003(c), the objecting party has the burden of
> proving that the exemptions claimed . . . are not properly claimed. . . .
> *When an issue is in doubt because of the proof provided and the Court*
> *would be required to speculate, the party upon whom the burden of proof*
> *ultimately rests must lose.*

*In re Cole*, 205 B.R. 382, 384-85 (Bankr. E.D. Tex. 1997) (emphasis added and citations omitted).

Thus, the Court concludes that the Amended Objections to Exemptions filed by FNFS and B&W should be sustained in part and denied in part and that the Debtor's claims of exemption under TEX. PROP. CODE §42.002(a)(1) & (8) are hereby denied as to the following items: photo equipment, including 3 cameras, valued at $800 and misc. hobby equipment, excluding golf clubs, valued at $400.  All other relief requested in the "FNFS Ltd.'s and B&W Finance Co, Inc.'s Amended Objections to Exemptions" is denied.

## Conclusion

The Court therefore concludes that the Debtor-Defendant, David S. Harwood, is entitled to the entry of a discharge order pursuant to 11 U.S.C. §727(a).

The Plaintiff, B&W Finance Co., Inc., shall recover from the Defendant, David S. Harwood, the sum of $36,100.00, plus pre-judgment interest in the amount of $6,118.20, accruing from September 12, 2005, the date the lawsuit was filed, until the date of

judgment at the rate of 5% per annum,[85] together with post-judgment interest upon such sums at the current federal post-judgment interest rate of 0.43% until paid.[86]  Such indebtedness is declared to be non-dischargeable pursuant to 11 U.S.C. §523(a)(4).

The Plaintiff, FNFS, Ltd., shall recover from the Defendant, David S. Harwood, the sum of $629,711.03, plus a recovery of attorneys' fees in the amount of $82,904.00, with an additional award of attorneys' fees in the amount of $20,000 in the event of an appeal to the United States District Court and an additional award of $20,000 in the event of an appeal to the United States Court of Appeals to the Fifth Circuit, together with post-judgment interest upon all such sums at the current federal post-judgment interest rate of 0.43% until paid.  Such indebtedness is declared to be non-dischargeable pursuant to 11 U.S.C. §523(a)(4).

The lien arising from the deed of trust issued on June 19, 1998 by David S. Harwood for the benefit of FNFS, Ltd. on that certain 20-acre tract located in the John Holden Survey, Abstract No. 450, Smith County, Texas is hereby declared **VALID,** subject to all prior recorded liens.

All other relief requested in the Amended Complaint filed by FNFS, Ltd. and B&W Finance Co., Inc. shall be denied and all other indebtedness of David S. Harwood

---

[85] *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 532 (Tex. 1998); Tex. Fin. Code Ann. §304.104 (West 2006)[regarding date of accrual]; Tex. Fin. Code Ann. §§ 304.003 & 304.103 (West 2006)[interest rate].

[86] 28 U.S.C. §1961.

to either of those Plaintiffs shall be subject to the discharge order rendered herewith.

Finally, as to the related contested matter, the Amended Objections to Exemptions filed by FNFS and B&W shall be sustained in part and denied in part and that the Debtor's claims of exemption under TEX. PROP. CODE §42.002(a)(1) & (8) shall be denied as to the following items: photo equipment, including 3 cameras, valued at $800 and misc. hobby equipment, excluding golf clubs, valued at $400. All other relief requested in the "FNFS Ltd.'s and B&W Finance Co, Inc.'s Amended Objections to Exemptions" shall be denied.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law[87] pursuant to Fed. R. Civ. P. 52, as incorporated into contested matters in bankruptcy cases by Fed. R. Bankr. P. 7052 and 9014. A judgment and a separate order on the related contested matter will be entered in a manner consistent with this opinion.

Signed on 04/28/2009

THE HONORABLE BILL PARKER
CHIEF UNITED STATES BANKRUPTCY JUDGE

---

[87] To the extent that any finding of fact located in the text or in a footnote of this memorandum is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law, located in the text or in a footnote of this memorandum is construed to be a finding of fact, it is hereby adopted as such. The Court reserves the right to make additional findings and conclusions as may be necessary.

-62-